Christina N. Goodrich (SBN 261722)
christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
Rachel Berman (SBN 352237)
rachel.berman@klgates.com
K&L Gates LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, California 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

[*Additional counsel on signature page*]

*Attorneys for Plaintiff Entropic*
*Communications, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>    *Plaintiff*,<br><br>    v.<br><br>COMCAST CORPORATION; COMCAST CABLE COMMUNICATIONS, LLC; AND COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC,<br><br>    *Defendants*. | Case No.: 2:25-cv-11402<br><br>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>REDACTED COPY OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL |

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Entropic Communications, LLC ("Entropic"), files this complaint for patent infringement against Comcast Corporation ("Comcast Corp."); Comcast Cable Communications, LLC ("Comcast Communications"); and Comcast Cable Communications Management, LLC ("Comcast Management") (collectively "Comcast") and in support thereof alleges as follows:

1.    This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including specifically 35 U.S.C. § 271, based on Comcast's infringement of U.S. Patent Nos. 10,135,682 (the "'682 Patent") and 9,866,438 (the "'438 Patent") (collectively, the "Patents-in-Suit").[1]

## THE PARTIES

2.    Entropic is a Delaware limited liability company with an office at 7150 Preston Road, Suite 300, Plano, Texas 75024.

3.    Entropic is the owner by assignment to all right, title, and interest to the Patents-in-Suit.

4.    Upon information and belief, Comcast Corp. is a corporation organized and existing under the laws of Pennsylvania, with a principal place of business at 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103.

5.    Comcast Corp. has, as its registered agent in California, CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203.

6.    Comcast Corp., along with the other defendants, develops, markets, sells, offers for sale and/or provides "Comcast" and "Xfinity" branded cable television services and equipment to customers.

7.    Comcast Communications is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 1701 JFK

---

[1] There is a pending action between the same two parties in the Central District of California concerning, among others, the same patent claims, Civil Action No. 23-cv-1050. Comcast has asserted, pursuant to a covenant not to sue, that the Court lacks subject matter jurisdiction over the original complaint in that case. All parties agree that the covenant giving rise to Comcast's arguments regarding a lack of subject matter jurisdiction has now expired.

1

Boulevard, Philadelphia, Pennsylvania 19103. Upon information and belief, Comcast Communications is a subsidiary of Comcast Corp.

8. Comcast Communications has, as its registered agent in California, CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203.

9. Comcast Communications, along with the other defendants, develops, markets, sells, offers for sale and/or provides "Comcast" and "Xfinity" branded cable television services and equipment to customers.

10. Comcast Management is a limited liability company organized and existing under the laws of Delaware, with a principal place of business at 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103. Upon information and belief, Comcast Management is a subsidiary of Comcast Corp.

11. Comcast Management has, as its registered agent in California, CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91203.

12. Comcast Management, along with the other defendants, develops, markets, sells, offers for sale and/or provides "Comcast" and "Xfinity" branded cable television services and equipment to customers.

13. Comcast Corp. and/or Comcast Communications owns or leases, and maintains and operates, several stores in this district by and through subsidiary limited liability companies that they own, manage, and control, including Comcast of Santa Maria, LLC and Comcast of Lompoc LLC. Upon information and belief, Comcast Corp. and/or Comcast Communications (and/or other personnel employed by them) negotiates and signs agreements on behalf of each of these entities.

14. Upon information and belief, Comcast Corp. and/or Comcast Communications are the corporate managers of their subsidiary LLCs that own or lease property in this district, and that own, store, sell, demonstrate, and lease equipment in this district. Comcast Corp. and/or Comcast Communications have the right to exercise near total control of each entity's operations through its LLC agreements with each entity.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

15.    In each of the stores referenced above, Comcast Corp. and/or Comcast Communications owns and stores equipment such as cable modems and set top boxes ("STBs"), and demonstrates various services that it offers to Comcast customers by and through subsidiary limited liability companies that it manages and controls.

16.    Upon information and belief, Comcast Corp. and/or Comcast Communications employs personnel that install, service, repair and/or replace equipment, as appropriate, in this district by and through subsidiary limited liability companies that it manages and controls.

17.    Upon information and belief, Comcast Corp. and/or Comcast Communications have two wholly owned subsidiaries in this Judicial District of Central California ("District") that serve as their agents.

18.    Comcast of Santa Maria, LLC ("Comcast Santa Maria") is a limited liability company organized and existing under the laws of Pennsylvania, with a principal place of business at 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103. Comcast Santa Maria is a subsidiary of Comcast Corp.

19.    Comcast Santa Maria, along with the other defendants, markets, sells, offers for sale and/or provides "Comcast" and "Xfinity" branded cable television services and equipment to customers.

20.    Comcast of Lompoc, LLC ("Comcast Lompoc") is a limited liability company organized and existing under the laws of Pennsylvania, with a principal place of business at 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103. Comcast Lompoc is a subsidiary of Comcast Corp.

21.    Comcast Lompoc, along with the other defendants, markets, sells, offers for sale and/or provides "Comcast" and "Xfinity" branded cable television services and equipment to customers.

22.    Upon information and belief, Comcast Communications, Comcast, Management, Comcast Santa Maria, and Comcast Lompoc are the agents of Comcast Corp. Upon information and belief, Comcast Corp. has complete and total control

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

over its agents Comcast Communications, Comcast Management, Comcast Santa Maria, and Comcast Lompoc. On information and belief, Comcast Corp. shares management, common ownership, advertising platforms, facilities, distribution chains and platforms, stores, and product lines and products involving related technologies with its agents, including at least Comcast Communications, Comcast Management, Comcast Santa Maria, and Comcast Lompoc.

23. For example, Comcast Corp., Comcast Communications, Comcast Management, Comcast Santa Maria, and Comcast Lompoc all have the same principal place of business at 1701 JFK Boulevard, Philadelphia, Pennsylvania 19103.

24. The Comcast "Xfinity Residential Services Agreement" purports to bind Comcast's customers, including those customers in this District, to an agreement with Comcast Communications for, *inter alia*, services that Comcast's customers receive.[2] This agreement further provides that an entity other than Comcast Communications provides the services. Upon information and belief, the entity that provides the services to Comcast's customers and subscribers is Comcast Management.

25. Comcast Management further shares a leadership team with Comcast Corp.[3] For example, Brian Roberts is the Chairman and Chief Executive Officer of both Comcast Management and Comcast Corp.; Daniel Murdock is Executive Vice President and Chief Accounting Officer of both Comcast Corp. and Comcast Management; Francis Buono is Executive Vice President of Legal Regulatory Affairs and Senior Deputy General Counsel of both Comcast Corp. and Comcast

---

[2] https://www.xfinity.com/Corporate/Customers/Policies/SubscriberAgreement.
[3] *Compare* names found in Exhibit A to the attached https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/communications-division/documents/video-franchising-and-broadband-analysis/video-franchising-main/applications-received--by-the-puc/2022/20220926-comcast-48a/comcast-48a-application.pdf *with* the bios of the identified personnel at Comcast's corporate leadership website, https://corporate.comcast.com/company/leadership.

4

Management; and Karen Buchholz is Executive Vice President, Administration of both Comcast Corp. and Comcast Management.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

27. Venue in this District is proper pursuant to 28 U.S.C. § 1400(b), because Comcast has regular and established places of business in this District. The defendants, by themselves and/or through their agents, have committed acts of patent infringement within the State of California and within this District, because they have located within this district Cable Modem Termination Systems that perform methods that infringe the Patents-in-Suit in the manner set forth in Exhibits 2 and 5.

28. This Court has general personal jurisdiction over Comcast Corp. because it conducts systematic and regular business within the State of California by, *inter alia* providing cable television, internet, and phone services to businesses and residents throughout the state. Comcast Corp.'s website states that, "Comcast is deeply committed to California, where our nearly 5,000 employees serve 3.4 million customers throughout the state."[4]

29. Upon information and belief, Comcast Management has a regular and established place of business in the State of California including at least at 3055 Comcast Place, Livermore, California 94551.

30. Upon information and belief, Comcast Corp., Comcast Communications, and Comcast Management, by themselves and/or through their agents, Comcast Santa Maria and/or Comcast Lompoc, operate their businesses through *inter alia* offices, warehouses, storefronts, and/or other operational locations

---

[4] *See*
https://california.comcast.com/about/#:%7E:text=Comcast%20is%20deeply%20committed%20to,smart%20home%E2%80%9D%20and%20phone%20service.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

within this District, including, for example, at the Xfinity by Comcast stores located in this District at 685 East Betteravia Rd., Santa Maria, California 93454; and 1145 N. H Street, Suite B, Lompoc, California 93436. Comcast holds out these locations as its own through the use of branding on the locations themselves.

31.     Comcast lists these Xfinity by Comcast stores on its website and holds them out as places where customers can obtain services and products offered by Comcast.

32.     Upon information and belief, one or more of the defendants owns and/or leases the premises where these Xfinity by Comcast stores are located.

33.     Upon information and belief, these Xfinity by Comcast stores are staffed by persons directly employed by Comcast, many of whom live in this District.

34.     Upon information and belief, one or more of the defendants has engaged in regular and established business at physical places within this District such as at the two Xfinity by Comcast stores referenced above.

35.     Upon information and belief, Comcast employs and/or contracts with persons and directs them to install, service, repair, and/or replace equipment, as appropriate, in this District.

36.     Upon information and belief, in each of these stores and/or service centers, Comcast owns and stores equipment such as cable modems and set top boxes and demonstrates services provided via those products to Comcast customers.

37.     Comcast has adopted and ratified the Comcast and Xfinity-branded locations identified in this District. The Comcast website advertises Comcast service packages available from Comcast-authorized retailers in this District, and prospective employees can find Comcast job listings in this District. Furthermore, the "corporate" section of Comcast's main website has a section containing "Special Information Regarding California Residents' Privacy Rights," which demonstrates that Comcast is purposefully holding itself out as providing products and services in California.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

38.    Upon information and belief, Comcast Corp., and/or Comcast Communications, by themselves and/or through their agent, Comcast Management, perform the acts set forth in Exhibits 2 and 5 that infringe the Patents-in-Suit throughout the United States and in this District

39.    Upon information and belief, Comcast Corp. and/or Comcast Management, by themselves, and/or through their agent, Comcast Communications, perform the acts set forth in Exhibits 2 and 5 that infringe the Patents-in-Suit throughout the United States and in this District.

40.    Venue is further proper because Comcast has committed and continues to commit acts of patent infringement in this District, including performing the acts set forth in Exhibits 2 and 5 that infringe the Patents-in-Suit.

41.    Comcast continues to conduct business in this District, including the acts and activities described in the preceding paragraphs.

## PRE-SUIT DISCUSSIONS

42.    Prior to filing this Complaint, Entropic sent a communication by physical means to Comcast on August 9, 2022, in an attempt to engage Comcast and/or its agents in good faith licensing discussions regarding Entropic's patent portfolio, including the Patents-in-Suit. Comcast replied to the communication on October 10, 2022, asking for additional information. On December 23, 2022, Entropic sent Comcast another communication regarding a separate license to Entropic's patents for the field of the standardized networking technology commonly called MoCA, and also seeking to discuss with Comcast a typical non-disclosure agreement in order to share information.

## ENTROPIC'S LEGACY AS A CABLE INNOVATOR

43.    Entropic Communications Inc. ("Entropic Inc."), the predecessor-in-interest to Plaintiff Entropic as to many of its intellectual-property assets, was founded in San Diego, California in 2001 by Dr. Anton Monk, Itzhak Gurantz, Ladd El Wardani and others. Entropic Inc. was exclusively responsible for the

7

development of the initial versions of the Multimedia over Coax Alliance ("MoCA") standards, including MoCA 1.0, ratified in 2006 and MoCA 1.1, ratified in 2007, and was instrumental in the development of MoCA 2.0, ratified in 2010. It also developed Direct Broadcast Satellite ("DBS") Outdoor Unit ("ODU") single wire technology and System-on-Chip ("SoC") solutions STBs in the home television and home video markets. Entropic was widely known in the cable industry for these innovations and its foundational development of MoCA.

44.    Under the technical guidance of Dr. Monk, Entropic Inc. grew to be publicly listed on the NASDAQ in 2007. After the public listing, the company acquired RF Magic, Inc. in 2007, a company specializing in DBS ODU technology and related hardware.

45.    Additional growth between 2007 and 2015 bolstered the technical expertise of Entropic Inc. with respect to signal acquisition, stacking, filtering, processing, and distribution for STBs and cable modems.

46.    For years, Entropic Inc. pioneered innovative networking technologies, as well as television and internet-related technologies. These technologies simplified the installation required to support wideband reception of multiple channels for demodulation, improved home internet performance, and enabled more efficient and responsive troubleshooting and upstream signal management for cable providers. These innovations represented significant advances in the field, simplified the implementation of those advances, and reduced expenses for providers and customers alike.

**MAXLINEAR'S TRANSFER OF PATENTS TO ENTROPIC**

47.    In 2015, MaxLinear, Inc. and MaxLinear, LLC (collectively, "MaxLinear")—leading providers of radio-frequency, analog, digital, and mixed-signal semiconductor solutions—acquired Entropic Inc., as well as the pioneering intellectual property developed by Dr. Monk and his team.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

48.    Plaintiff Entropic was established in 2021 ███████████



49.    ███████████████████████████████████████████

███████████████████████████████████████████

███████

50.    ██████████████████████████████████████████

███████████████████████████████████████████

███████.

51.    Entropic has the full right to pursue the patent infringement claims asserted in this action against Comcast, including the right to recover past damages for any such infringement.

**A.    The VSA Between Comcast Management and MaxLinear, Inc. Does Not Prohibit Entropic's Action Against Comcast**

52.    No contractual provision exists, nor has any provision ever existed, that deprives Entropic of the right to sue Comcast for the patent infringement claims asserted in this action.

53.    Comcast has previously argued[5] that MaxLinear, Inc. and Comcast Management entered into a Vendor Support Agreement ("VSA") with an effective date of August 1, 2020, although it was apparently executed in ███████████

---

[5] Herein, Entropic references and/or repeats certain arguments advanced in *Entropic Commc'ns, LLC v. Comcast Corp., et al.*, Case No. 2:23-cv-01050 (C.D. Cal., filed Feb. 10, 2023) (consol. *Entropic Commc'ns, LLC v. Cox Commc'ns, Inc., et al.*, Case No. 2:23-cv-01049 (C.D. Cal., filed Feb. 10, 2023) (Lead Case)) (hereinafter, "Case No. 01050"). To the extent certain of these arguments have been presented to the Court in Case No. 1050 and addressed therein, Entropic presents them here solely to preserve its rights, for instance in the event that Comcast asserts that the VSA has not been terminated; that, despite its termination, the VSA continues to impact Entropic's

9

54.    Comcast has further argued that the VSA includes a covenant not to sue and has incorrectly argued that Entropic is allegedly bound by such covenant. This alleged covenant not to sue only applies during the term of the VSA (the period between the August 1, 2020, effective date and the VSA termination date is hereinafter referred to as the "Term").

55.    Entropic is not a party to the VSA and did not sign it nor has Entropic taken any action to ratify or participate in the VSA.

56.    Entropic has not been assigned any portion of MaxLinear, Inc.'s rights or obligations under the VSA, nor has Entropic been assigned the VSA itself.

57.    Indeed, the VSA contains a ▇▇▇▇▇▇▇ provision, and any covenants under the VSA are personal to MaxLinear, Inc. and do not run with the assignment of any of MaxLinear, Inc.'s patents.

58.    The VSA does not list any intellectual property by registration or application number that is allegedly subject to any provision of the VSA, including but not limited to the alleged covenant not to sue.

59.    By its terms, the VSA is a development agreement that provided that Comcast may request that MaxLinear, Inc. "provide certain services, which could include deliverables and support." See VSA, § 1.1.

60.    The VSA does not convey any rights to Comcast to use or practice any of the patents owned by MaxLinear, Inc. or MaxLinear, LLC, nor does the VSA grant Comcast a license to any of the Patents-in-Suit. See VSA, § 7.1(d).

61.    Indeed, the VSA expressly notes ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Rather, the agreement is a services contract that deals with MaxLinear, Inc.'s potential performance of services for Comcast at some point in the future. Further, no

_____

claims for infringement during certain time periods; and/or, as necessary with respect to further proceedings in this Court or elsewhere with respect to any such issues. Entropic does not intend to relitigate in this case issues or arguments that have been finally resolved in a prior matter.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

provision of the VSA authorizes Comcast to commit any act that would otherwise be patent infringement.

62. The VSA also does not grant Comcast any "have made" rights. Section 7.3 of the VSA only references Comcast's "purchase, use, or deployment" of products, but not its right to have any products made by third parties.

63. The VSA expressly provides that Section 7 does not preclude MaxLinear, Inc., or any other entity, from asserting infringement claims against Comcast's third-party vendors, including the manufacturers or providers of Comcast's products.

64. On information and belief, Section 7.3 was only intended to prevent Comcast from suing MaxLinear for infringement arising from: (1) products made by MaxLinear; and (2) services performed by MaxLinear pursuant a Statement of Work ("SOW"), as that term is defined in the VSA.[6] ████████████████████ ██████████████████████████████████████████████████ ████████████████████████. Thus, Section 7.3 does not preclude MaxLinear, Inc., or any other party, from suing Comcast for infringement based on any product or service that was not created or performed pursuant to a SOW under the VSA.

65. The VSA does not preclude MaxLinear, Inc. from bringing suit for patent infringement relating to infringing conduct that took place during the Term of the VSA, following expiration or early termination of the VSA.

66. At most, the relevant provisions of the VSA act as a "Covenant to Sue Later," which does not travel with any patents or other intellectual property rights. In other words, no provision of the VSA encumbered any patents with licenses or other rights and therefore no provisions of the VSA are enforceable as to future owners of the patents owned by MaxLinear, Inc., the party to the VSA.

---

[6] On information and belief, the failure to capitalize "Service" in this section was a typographical error.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

67.    The express terms of the Covenant to Sue Later permit MaxLinear, Inc. to bring patent infringement claims against Comcast for patents owned by MaxLinear, Inc. where the infringement is willful infringement, even during the Term of the VSA. Comcast also admits, under its interpretation, that Section 7 is terminated and has no effect if Comcast willfully infringed a MaxLinear patent prior to the execution of the VSA.

68.    No covenant or other agreement under Section 7 of the VSA, including the Covenant to Sue Later, prevents Entropic from bringing suit under any patent ████████████████████, including but not limited to the Patents-in-Suit. *See* VSA, § 7.

69.    Finally, no provision of the VSA precludes MaxLinear, Inc. or any other entity from, after the Term of the VSA expires or terminates, asserting patent infringement claims against Comcast for infringing conduct that took place during the Term.

70.    The VSA states that its term expires on July 31, 2026. However, the VSA permits MaxLinear, Inc. to terminate the VSA prior to July 31, 2026, upon 90 days' written notice and after there has been no active Statement of Work (SOW) for a period of one year. (*See Comcast Cable Commc'ns Mgmt., LLC v. MaxLinear, Inc.*, No. 23 CIV. 4436 (AKH), 2024 WL 4240770, at *1–2 (S.D.N.Y. Sept. 19, 2024) (discussing termination of VSA).)

71.    In ████████, MaxLinear, Inc. and Comcast executed a SOW with a term extending through July 31, 2026. The SOW permits early termination at any time upon one year's written notice to Comcast.

72.    On May 23, 2023, MaxLinear, Inc. sent Comcast written notice of early termination of both the VSA and SOW.

73.    As a result of MaxLinear's May 23, 2023 notice, the ████████ SOW terminated on May 23, 2024.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

74.    By May 23, 2025, there had been no active SOW under the VSA for one year.

75.    The VSA was terminated, upon written notice, 90 days after there had been no active SOW under the VSA for one year. Ninety days from May 23, 2025, is August 21, 2025.

76.    In related litigation between MaxLinear, Inc. and Comcast, the District Court for the Southern District of New York found—based on MaxLinear, Inc.'s May 23, 2023 notice—that the "earliest termination date of the VSA is . . . August 21, 2025." (*See* Order, *Comcast Cable Commc'ns Mgmt., LLC v. MaxLinear, Inc.*, Case No. 1:23-cv-04436 (S.D.N.Y. Jan. 15, 2025), ECF No. 173.)

77.    On information and belief, Comcast has claimed it received MaxLinear, Inc.'s May 23, 2023 written notice on May 24, 2023. Therefore, the latest termination date of the VSA is August 22, 2025.

78.    As of this filing, the VSA is no longer in effect, having terminated on or about August 21 or 22, 2025.

**B.    Comcast Has, and Continues, to Willfully and Intentionally Infringe the Patents-in-Suit**

79.    The VSA, by its own terms, did not restrict MaxLinear's, or any other party's, right to bring claims of willful patent infringement at any time.

80.    Comcast has had knowledge of the Patents-in-Suit and, on information and belief, its infringement of them, as set forth below. Despite such knowledge, Comcast continued its infringement, and thus willfully infringed the Patents-in-Suit. The VSA does not impact and has not impacted such claims.

**1.    Comcast's Notice Of The '682 Patent Through The Charter Suit**

81.    On information and belief, Comcast had knowledge of its infringement of certain of the Patents-in-Suit based on its awareness of the patent infringement suit filed by Entropic against Charter Communications, Inc. ("*Charter*") in the Eastern

District of Texas, Case No. 2:22-CV-00125-JRG, on April 27, 2022. This suit asserted, among others, the '682 Patent against Charter.

82.     Both Charter and Comcast are part of the close-knit business community that is the cable industry, which is led by key industry players. These key players work collaboratively to develop new technology and programs to drive the industry forward, including through organizations like MoCA and the Society of Cable Telecommunications Engineers.

83.     Comcast and Charter actively collaborate together, have monthly meetings across various departments, and have even collaborated together on accused technologies. Specifically, Comcast and Charter have collaborated together on Profile Management Application ("PMA") technology.

84.     On information and belief, Comcast's PMA implementation infringes the '682 Patent in substantially the same manner as Charter's PMA implementation. Given the amount of collaboration that occurs between Charter and Comcast, Comcast was, on information and belief, aware of Entropic's claims against Charter's PMA implementation.

85.     Comcast and Charter also collaborate together at events for the Society of Cable Telecommunications Engineers ("SCTE"), of which both Comcast and Charter are members. Among other things, Comcast and Charter participate in panels together, share data and achievements related to SCTE, and work on peer-reviewed papers together.

86.     Charter and Comcast also "team up" to offer streaming devices and other technology to customers. Indeed, The New York Times published an article about such a joint venture between Comcast and Charter on April 27, 2022, the very same day that the first suit against Charter was filed.

87.     As evidenced by this article, and further on information and belief, Comcast knows that Charter utilizes technology that functions almost identically to Comcast's technology.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

88.   Among other things, Charter and Comcast utilize similar product offerings that incorporate the same technologies. Charter and Comcast purchase their products, including cable modems, STBs, and CMTS hardware and software, from the same third parties. These products utilize the same or similar SoCs and other processors and provide similar functionality.

89.   Given the close business relationship between Comcast and Charter, as well as the joint ventures that Comcast was pursuing with Charter when Entropic's 2022 suit was filed against Charter, Comcast was almost certainly aware of its filing.

90.   Upon information and belief, and based on Comcast's awareness of the substantial similarities between Comcast's and Charter's technology and products, Comcast analyzed the claims asserted against Charter, the '682 Patent, and its own PMA functionality.

91.   Upon information and belief, Comcast thereafter knew that it infringed, or that there was a high likelihood that it infringed, the '682 Patent in substantially the same manner as Charter.

92.   Nevertheless, Comcast continued to infringe the '682 Patent, for instance by continuing the acts set forth in Exhibit 2. This infringement was willful, and therefore an action based upon it was not and could not have been subject to any provision of the VSA.

**2.    Comcast's Notice Of The Patents-in-Suit Through Prior Litigation**

**i.     The Original Complaint In Entropic's 2023 Suit**

93.   Before the filing of this Complaint, and specifically on February 16, 2023, Comcast accepted service of Entropic's original Complaint in its 2023 lawsuit alleging infringement of the '682 Patent. *See* Case No. 01050, DE 1. Entropic hereby incorporates its original complaint filed in Case No. 01050 (the "Original Complaint") into this Complaint by reference.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

94. Entropic's Original Complaint specifically set forth detailed allegations of how Comcast infringed the '682 Patent.

95. On information and belief, Comcast thereafter analyzed Entropic's allegations of infringement.

96. Thus, Comcast has been aware that it infringed the '682 Patent at least since the service of Entropic's Original Complaint, on February 16, 2023. Nevertheless, Comcast continued to infringe the '682 Patent, for instance by continuing the acts set forth in Exhibit 2. This infringement was willful, and therefore an action based upon it is not and could not have been subject to any provision of the VSA.

### ii. The First Amended Complaint In Entropic's 2023 Suit

97. Before the filing of this Complaint, and specifically on June 5, 2023, Comcast was served with Entropic's First Amended Complaint in Case No. 01050 alleging infringement of the '682 Patent. *See* Case No. 01050, DE 63. Entropic hereby incorporates its First Amended Complaint filed in Case No. 01050 into this Complaint by reference.

98. Entropic's First Amended Complaint set forth specific allegations of Comcast's infringement of the '682 Patent.

99. On information and belief, Comcast thereafter analyzed Entropic's allegations of infringement.

100. Thus, Comcast has been aware that it infringed the '682 Patent since the service of Entropic's First Amended Complaint, on June 5, 2023. Nevertheless, Comcast continued to infringe the '682 Patent, for instance by continuing the acts set forth in Exhibit 2. This infringement was willful, and therefore an action based upon it is not and could not have been subject to any provision of the VSA.

### iii. Entropic's Infringement Contentions In Its 2023 Suit

101.   Further, Entropic's Case No. 01050 infringement contentions, served on September 15, 2023 (as to the '682 Patent) and November 3, 2023 (as to the '438 Patent), provided Comcast additional notice of infringement.

102.   Entropic's '682 Patent infringement contentions in Case No. 01050, which were served on Comcast on September 15, 2023, set forth Entropic's infringement positions in detail, and included charts setting forth how Comcast specifically infringed the '682 Patent.

103.   In particular, Entropic identified how Comcast's development and use of a PMA system that generates and transacts D3.1 downstream (DS) profiles infringes Entropic's '682 Patent.

104.   Thus, Comcast has been aware that it infringed the '682 Patent since at least September 15, 2023.

105.   Thereafter, Entropic sought to amend the Complaint in Entropic's Case No. 01050 to add the '438 Patent.[7] To that end, Entropic proactively served infringement contentions for the '438 Patent in Case No. 01050 on Comcast on November 3, 2023.

106.   Like the '682 infringement contentions, Entropic's '438 infringement contentions identified how Comcast's development and use of a PMA system that generates and transacts D3.1 downstream (DS) profiles infringes Entropic's '438 Patent.

107.   Thus, Comcast has been aware that it infringed the '438 Patent since at least November 3, 2023.

---

[7] Entropic filed a Motion for Leave Amend its First Amended Complaint in Case No. 01050, which Motion for Leave was filed in the lead 01049 case. *See Entropic Communications v. Cox Communications, Inc. et al.*, Case No. 2:23-cv-01049 (C.D. Cal.), DE 115. This Motion sought to amend the First Amended Complaint to, *inter alia*, add allegations regarding the '438 Patent and a Count for infringement of the same. To that end, Entropic proactively served infringement contentions for the '438 Patent on Comcast on November 3, 2023. That Motion was ultimately granted on August 6, 2025. *Id.* DE 384.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

108.   To date, Comcast has continued its wrongful and willful use of the Patents-in-Suit, for instance by continuing the acts set forth in Exhibits 2 and 5. This infringement was willful, and therefore an action based upon it is not and could not have been subject to any provision of the VSA.

**THE TECHNICAL PROBLEM SOLVED BY THE PATENTS-IN-SUIT**

109.   The '682 and '438 Patents solve a technical problem relating to the operation of wide-area hybrid fiber-coaxial (HFC) networks used by cable providers to deliver video and internet services to their customers.

110.   HFC networks connect a cable "head-end" facility on the operator side of the network to cable modems located in a large number of buildings, or customer premises.

111.   The head-end of an HFC network houses, at least in part, a system known as a Cable Modem Termination System, or CMTS. A CMTS provides, among other things, a physical interface for dozens or hundreds of physical fiber connections that branch out into the HFC network. The CMTS also controls communications over those physical connections. A CMTS includes physical circuitry, and can also include, as the '682 Patent teaches, "any software and/or firmware ("code") which may configure the hardware, be executed by the hardware, and or otherwise be associated with the hardware." ('682 Patent col. 2, lines 34-36.)[8]

112.   The fibers connected to the CMTS branch out into the physical world to create the HFC network, taking different paths to reach different cable modems located in different buildings at different distances from the CMTS. An example HFC network is shown in Figure 1 of the '682 and '438 Patents:

---

[8] The '682 and '438 Patents teach that their claimed inventions, which relate to functionality of a CMTS, "may be realized in a centralized fashion in at least one computing system, or in a distributed fashion where different elements are spread across several interconnected computing systems." ('682 Patent, col. 7, lines 33-36.)

18

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT



FIG. 1

113.    As shown in Figure 1, signals that travel along the paths between the CMTS and the end users' cable modems pass through a number of types of network equipment. For instance, as the '682 and '438 Patents teach, these signals may pass through a "fiber node" which, as the patents teach, "convert[s] between optical signals connected via the fiber optic cable 103 and electrical signals conveyed via [a] coaxial cable." ('682 Patent, col. 3, lines 18-21.)

114.    As the '682 and '438 Patents teach, signals traveling from the CMTS to a cable modem may also pass through "amplifiers" "which may amplify [the] signals" by increasing their power. ('682 Patent, col. 3, lines 22-24). They also pass through "splitters," which take an input signal and output it "onto each of its other interfaces," thus branching or splitting the signal from a single input into multiple output paths. ('682 Patent, col. 3, lines 38-41.)

115.    As a result of the physical structure of HFC networks, the path between the CMTS and each cable modem is different. For instance, different paths can

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

traverse over different lengths of cable or fiber, pass through different numbers and types of amplifiers and splitters, and be subject to different sources of interference from external sources such as cellular radio waves, water ingress, and others.

116. These path differences can result in different cable modems connected to the same CMTS experiencing marked differences in signal quality.

117. Further, the signal quality experienced by a given cable modem can also change over time, for instance, if sources of interference appear or disappear, if the physical condition of the network equipment changes or is altered, and so on.

118. In the communications field, metrics related to the "signal to noise ratio" (or SNR) are frequently used to measure signal quality. In general terms, the SNR of a received signal relates to the ratio of power of the information-carrying signal—that is, the energy in a signal that carries data such as internet or video data—to that of unwanted "noise" that is introduced by, for instance, interference. As the '682 and '438 Patents teach, other measurements that are related to SNR, such as SNR over a range of frequencies, could also be used to measure the quality of a signal and thus the performance of the communication link that carried it.

119. Thus, the differences in signal quality, and therefore performance, experienced by different cable modems that are connected to the same CMTS can be reflected in measured differences in the SNR, or a related metric.

120. All else being equal, a communication channel with better signal quality allows for more data to be communicated in a given unit of time than one with lower signal quality.

121. One way this difference may be manifested is in the "modulation order" used for communication.

122. Generally speaking, higher order modulation techniques allow for the transmission of more bits of data in a single "symbol." Higher order modulation techniques thus allow for higher data rates, but require high quality channels (for instance, channels with a high SNR) to allow error-free transmission. In contrast,

20

generally speaking, lower order modulation techniques transmit fewer bits of data in a "symbol," resulting in lower data rates, but can be used successfully in lower quality channels (for instance, channels with a lower SNR) because they are more robust in the presence of noise and interference.

123.   The variability in signal quality between different users connected to the same CMTS led to a technical problem for cable operators. Specifically, operators were faced with the problem of how to ensure that their CMTSs could successfully communicate with the different modems connected to them, even when the signal quality varied between modems and over time, while efficiently managing the capacity of the HFC network. This problem arose, in part, due to the physical structure of HFC networks.

124.   A simple prior art approach configured the CMTS to use the same communications parameters (such as modulation scheme) for all connected cable modems, or for a fixed, pre-selected set of modems. In this approach, the CMTS would have to use parameters that allowed all of the relevant modems—including those with the worst signal quality—to successfully receive the signal. In practice, this meant that the modems were limited by the modulation order, and hence data rate, that the modem with the worst signal could support. This was often known as the "lowest common denominator" problem.

125.   This basic prior art approach suffered from a number of drawbacks. Most obviously, the performance of modems with better signal quality was limited by the communication parameters that the worst-performing modems could support. This led to lower data rates and limited network capacity, with some cable modems having the potential to support data rates higher than what they were allowed in practice.

126.   Another way the prior art addressed the problem of different modems experiencing different channel conditions was by using the logical channel construct. As an example, U.S. Patent Application No. 2013/0041990 ("Thibeault"), teaches a

21

method of dividing a physical channel into multiple logical channels in which each logical channel has its own fixed communication parameters, such as a modulation scheme.

127.   Thibeault teaches that a CMTS can assign cable modems to a particular logical channel based on their performance capabilities.

128.   U.S. Patent Application No. 2007/0223512 ("Cooper") provides another example of a prior art approach that used the concept of "logical channels." In Cooper, a human operator pre-assigns a set of configuration parameters, including modulation profiles, to each of a series of logical channels. Once an operator has set up the relevant parameters, individual modems can be assigned to communicate with the CMTS on different of these channels.

129.   The "logical channel" approach of the prior art had advantages over simply assigning each modem in a set the same parameters, but also suffered from drawbacks and limitations.  One was that the modulation profile for each logical channel was predetermined—that is, the communications parameters are fixed and known ahead of time. As a result, this approach was inflexible and limited in its ability to respond to changes in the network environment.

130.   The earliest claimed priority date of the '682 and '438 Patents is July 23, 2012.

131.   The techniques discussed above represent the state of the art in the field relevant to the '682 and '438 Patents as of July 23, 2012.

132.   The claims of the '682 and '438 Patents recite techniques for addressing the technical challenges described above: specifically, how a CMTS can effectively communicate over an HFC network with different cable modems that can experience different, and changing, channel conditions.

133.   For example, claim 1 of the '682 Patent requires assigning, by a CMTS, each cable modem among a plurality of "service groups" based on a "corresponding SNR-related metric"; generating, for each service group, a "composite SNR-related

22

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

metric based at least in part on a worst-case SNR profile" corresponding to the group; and selecting, by the CMTS, "one or more physical layer communication parameters[s] to be used for communicating with one of [the] plurality of service groups."

134.    "Physical layer communications parameters" control how signals are sent over the physical medium that carries them—here, the fiber and coaxial cable of the HFC network. As the '682 and '438 Patents teach, examples of physical layer communications parameters include "encoding parameters, modulation parameters, transmit power, receive sensitivity, timeslot duration, channel(s) or subcarrier(s) on which to transmit, and/or the like." ('682 Patent, col. 4, lines 56-60.)

135.    Claim 1 of the '682 Patent recites a technical solution that improves the way in which a HFC network operates. For instance, the techniques of claim 1 of the '682 Patent change the physical-layer parameters, such as the modulation order, transmit power, duration, or others, that the CMTS uses to communicate with cable modems. Changes to physical-layer communications parameters such as these result in observable changes to the optical or electrical behavior of the HFC network.

136.    Further, the techniques of claim 1 of the '682 Patent increase the overall capacity of the HFC network by grouping modems based on an SNR-related metric and choosing communication parameters based a "worst-case SNR profile" derived from the group.

137.    The claimed SNR-related-metric-based grouping allow for modems with relevant similarities in performance to be grouped together. That, in turn, allows the CMTS to calculate a "worst-case SNR profile" for a group without that profile being extremely suboptimal for individual modems, as was often the case in the prior art. This meant that any given modem was less likely to be forced to communicate using a suboptimal (i.e. slower) set of physical layer communications parameters to accommodate modems experiencing a lower relative signal quality.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

138.    The techniques of claim 1 of the '682 Patent also change the distribution of capacity available to communicate with different cable modems by allowing modems with higher signal qualities (and thus better SNR-related metrics) to be grouped together and assigned communication parameters that support faster communications speeds.  The claimed techniques thus change the total amount of data that is and can be carried over the network, as well as the how much data can be transmitted to each of the different cable modems in a given unit of time.

139.    The other independent claims of the '682 Patent, and the independent claims of the '438 Patent, contain similar limitations to those discussed above, and the allegations of paragraphs 109-138 apply to them as well.

140.    Comcast itself has touted the technological benefits provided by the '682 and '438 Patents.

141.    In 2020, a Comcast engineer named Maher Harb, along with several co-authors, published a paper entitled "Full Scale Deployment of PMA."

142.    In their 2020 paper, Mr. Harb and his co-authors stated that the implementation of PMA in Comcast's cable network yielded "capacity improvements of more than 30% in the downstream (towards customers) direction, and of approximately 20% in the upstream direction (from customers)."

143.    In 2022, Mr. Harb, along with several co-authors, published a paper entitled "Deploying PMA-Enabled OFDMA in Mid-Split and High-Split."

144.    In this paper, Mr. Harb and his co-authors stated that the deployment of a PMA system is "required" in order to "take full advantage" of other technological improvements in network performance. In particular, as Mr. Harb's 2022 paper explained, PMA provides a technical solution to the problem of ingress, which occurs when transmissions from outside an HFC network interfere with the transmissions occurring over such a network. In the 2022 paper, Mr. Harb and his co-authors stated that the use of PMA is "essential" because of the "ingress and distortion challenges"

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

that arise in a network, including interference from "over-the-air broadcast transmissions."

145.   The efficiency gains described above allowed, as a technical matter, the operator of an HFC network to achieve capacity gains without the expense of installing and maintaining additional infrastructure to support additional data throughput.

146.   Thus, the claimed invention of the '682 and '438 Patents addresses technological problems with network performance, such as the "lowest common denominator" problem and interference ingress from outside sources, so as to enable cable modems to receive higher speed services and provide faster communication.

147.   The '682 and '438 Patents claim techniques that, given the state of the art, embody an inventive concept, and were neither routine nor conventional as of July 23, 2012. For example, as described above, it was not routine and conventional to group cable modems according to the conditions they were experiencing, create a composite quality metric for each group based on the worst-case SNR profile within the group, and use that metric to select the physical layer parameters to communicate with the group.

148.   For instance, in the prior art "logical channel" approach, as described above with respect to Thibeault and Cooper, physical layer parameters for different channels are chosen and cable modems are then assigned to the pre-set logical channels. The "logical channel" approach was thus fundamentally different from grouping cable modems and deriving the physical layer parameters for communicating with them based on a worst-case profile for the group.

149.   Recent decisions from the Patent Trial and Appeal Board provide further confirmation that the claims of the '682 and '438 Patents recite elements that are not routine and conventional.

150.   For instance, in two decisions in IPR2024-00444 and IPR2024-00445, the Patent Trial and Appeal Board refused to even institute *inter partes* review (IPR)

25

proceedings that challenged the '682 Patent as obvious based in large part on the Thibeault and Cooper references discussed above. The PTAB's findings are consistent with the fact that the claims of the '682 Patent include elements that were not routine and conventional as of July 2012.

## COUNT I

## (Infringement of the '682 Patent)

151.   Entropic incorporates by reference each allegation of the foregoing paragraphs as if fully set forth herein.

152.   Entropic served infringement contentions in Case No. 01050, which included a claim chart for the '682 Patent on September 15, 2023.

153.   The '682 Patent duly issued on November 20, 2018, from an application filed January 9, 2018, an application filed February 16, 2017, an application filed August 4, 2016, an application filed July 23, 2013, and, *inter alia* a provisional application filed July 23, 2012.

154.   Entropic owns all substantial rights, interest, and title in and to the '682 Patent, including the sole and exclusive right to prosecute this action and enforce the '682 Patent against infringers and to collect damages for all relevant times.

155.   The '682 Patent generally describes a method performed by a cable modem termination system and/or converged cable access platform, the method including determining a corresponding signal-to-noise-ratio ("SNR") related metric, assigning cable modems to service groups based on a respective corresponding SNR-related metric, generating a composite SNR-related metric based on a worst-case SNR profile, selecting a physical layer communication parameter to be used for communicating with a service group based on a composite SNR-related metric, and communicating with cable modems in the service group using the selected physical layer communication parameter. A true and accurate copy of the '682 Patent is attached hereto as Exhibit 1.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

156.   The '682 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101, for at least the reasons set forth above in Paragraphs 109-150.

157.   The '682 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

158.   Comcast infringes, directly and/or indirectly, at least claim 1-5 and 9 of the '682 Patent by performing or causing to be performed the steps set forth in those claims in the manner and for at least the reasons set forth with respect to those claims in the infringement contentions served on Comcast in Case No. 01050 on September 15, 2023 (attached hereto as Exhibit 2).[9]

159.   On information and belief, Comcast's demonstration of products in brick-and-mortar stores at 685 East Betteravia Rd., Santa Maria, California, 93454; and 1145 N. H Street, Suite B, Lompoc, California 93436, or to, for example, testing of those products, constitute acts of direct infringement of at least Claims 1-5 and 9 of the '682 Patent.

160.   Comcast has known of or has been willfully blind to the '682 Patent since before, and no later than the date of, its acceptance of service of the Original Complaint in Case No. 01050 on February 16, 2023.

161.   Comcast has known of or has been willfully blind to the '682 Patent since before, and no later than the date of, its acceptance of service of the First Amended Complaint in Case No. 01050 on June 5, 2023.

162.   Comcast has known of or has been willfully blind to the '682 Patent since before, and no later than the date of, its acceptance of service of Entropic's infringement contentions in Case No. 01050 on September 15, 2023.

163.   Comcast has been aware that it infringes the '682 Patent since no later than the date of, its receipt of Entropic's August 9, 2022, communication, attached

---

[9] The original claim chart for this patent was filed with this Court at Case No. 01050, DE 63.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

as Exhibit 3. Since obtaining knowledge of the '682 Patent and its infringing activities, Comcast has failed to cease its infringing activities.

164. Comcast's infringement of the '682 Patent thus is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

165. Entropic has been damaged as a result of the infringing conduct alleged above. Comcast is liable to Entropic in an amount that compensates Entropic for Comcast's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

166. No apparatus claims of the '682 Patent are presently asserted. Accordingly, there is no duty to mark pursuant to 35 U.S.C. § 287.

## COUNT II
### (Infringement of the '438 Patent)

167. Entropic incorporates by reference each allegation of foregoing paragraphs as if fully set forth herein.

168. Entropic served an infringement contention claim chart for the '438 Patent in Case No, 01050 on November 3, 2023.

169. The '438 Patent duly issued on January 9, 2018, from an application filed February 16, 2017, an application filed August 4, 2016, an application filed July 23, 2013, and, *inter alia* a provisional application filed July 23, 2012.

170. Entropic owns all substantial rights, interest, and title in and to the '438 Patent, including the sole and exclusive right to prosecute this action and enforce the '438 Patent against infringers and to collect damages for all relevant times.

171. The '438 Patent generally describes a mechanism for determining communication parameters for communications between a cable modem termination system and cable modems. A true and accurate copy of the '438 Patent is attached hereto as Exhibit 4.

172.    The '438 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101, for at least the reasons set forth above in Paragraphs 109-150.

173.    The '438 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

174.    Comcast infringes, directly and/or indirectly, at least claim 1-5 and 9 of the '438 Patent by performing or causing to be performed the steps set forth in those claims in the manner and for at least the reasons set forth with respect to those claims in the infringement contentions served on Comcast in Case No. 01050 on November 3, 2023 (attached hereto as Exhibit 5).

175.    On information and belief, Comcast's demonstration of products in brick-and-mortar stores at 685 East Betteravia Rd., Santa Maria, California, 93454; and 1145 N. H Street, Suite B, Lompoc, California 93436, or, for example, testing those products, constitute acts of direct infringement of at least Claims 1-5 and 9 of the '438 Patent.

176.    Comcast has known of or has been willfully blind to the '438 Patent since before, and no later than the date of, its acceptance of service of Entropic's infringement contentions in Case No. 01050 on November 3, 2023.

177.    Since obtaining knowledge of the '682 Patent family, of which the '438 Patent is a member, and its infringing activities, Comcast has failed to cease its infringing activities.

178.    Comcast has been aware that it infringes the '438 Patent since well before, and no later than the date of, its receipt of Entropic's infringement contention claim charts served in Case No, 01050 on November 3, 2023. Since obtaining knowledge of the '438 Patent and its infringing activities, Comcast has failed to cease its infringing activities.

179.    Comcast's infringement of the '438 Patent thus is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

180.    Entropic has been damaged as a result of the infringing conduct alleged above. Comcast is liable to Entropic in an amount that compensates Entropic for Comcast's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

181.    No apparatus claims of the '438 Patent are presently asserted. Accordingly, there is no duty to mark pursuant to 35 U.S.C. § 287.

## **PRAYER FOR RELIEF**

WHEREFORE, Entropic requests that:

A.    The Court find that Comcast has directly and/or indirectly infringed the Patents-in-Suit and hold Comcast liable for such infringement;

B.    The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate Entropic for Comcast's past infringement of the Patents-in-Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

C.    The Court find that Comcast willfully infringed the Patents-in-Suit, and increase the damages to be awarded to Entropic by three times the amount found by the jury or assessed by the Court;

D.    The Court declare that this is an exceptional case entitling Entropic to its reasonable attorneys' fees under 35 U.S.C. § 285; and

E.    The Court award such other relief as the Court may deem just and proper.

Dated: November 26, 2025          **K&L GATES LLP**

By: */s/ Christina Goodrich*
Christina Goodrich (SBN 261722)
Connor J. Meggs (SBN 336159)
Rachel Berman (SBN 352237)
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 552-5000
Fax: (310) 552-5001

30

christina.goodrich@klgates.com
connor.meggs@klgates.com
rachel.berman@klgates.com

James A. Shimota (*pro hac vice forthcoming*)
70 W. Madison Street, Ste. 3300
Chicago, Illinois 60602
Telephone: (312) 807-4299
Fax: (312) 827-8000
jim.shimota@klgates.com

***Attorneys for Plaintiff Entropic Communications, LLC***

31

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

# **JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Entropic hereby requests a trial by jury on all issues raised by this Complaint.

Dated: November 26, 2025                **K&L GATES LLP**

By: */s/ Christina Goodrich*
Christina Goodrich (SBN 261722)
Connor J. Meggs (SBN 336159)
Rachel Berman (SBN 352237)
10100 Santa Monica Boulevard,
8th Floor
Los Angeles, CA 90067
Telephone: (310) 552-5000
Fax: (310) 552-5001
christina.goodrich@klgates.com
connor.meggs@klgates.com
rachel.berman@klgates.com

James A. Shimota (*pro hac vice forthcoming*)
70 W. Madison Street, Ste. 3300
Chicago, Illinois 60602
Telephone: (312) 807-4299
Fax: (312) 827-8000
jim.shimota@klgates.com

***Attorneys for Plaintiff Entropic
Communications, LLC***

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT